IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

United States District Court
Southern District of Texas
FILED

SEP 1 4 2010

David J. Bradley, Clerk
Laredo Division

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )   Case No. __5:10-cv-102__
                               )
      vs.                      )   Case No. 5:05-CR-229-5
                               )
BAUDEL ORTIZ,                  )
                               )
      Defendant/Petitioner.    )   **HONORABLE MICAELA ALVAREZ**

- - - - - - - - - - -

### MEMORANDUM IN SUPPORT OF PETITIONER'S
### 28 U.S.C. § 2255 MOTION TO VACATE, SET ASIDE, OR CORRECT

- - - - - - - - - - -

COMES NOW, Baudel Ortiz, Petitioner, pro se, pursuant to 28 U.S.C. § 2255, to request the Court to vacate, set aside, or correct the sentence in the above captioned Case. Mr. Ortiz alleges he received ineffective assistance of counsel, the guilty plea, entered before the Court was not knowingly and intelligently made, and Mr. Ortiz' Sixth Amendment right was violated when facts were not found by a jury or admitted by him then used to increase the imposed sentence. Finally, Mr. Ortiz alleges the Court did not have proper jurisdiction to adjudicate the Case. The reasons for these propositions are detailed in the following arguments.

Due to Mr. Ortiz' Constitutional violations and the Court not having jurisdiction, Ortiz request for the conviction and/or sentence to be set aside and for the Court to Order an immediate release from the imprisonment he has been serving.

Mr. Ortiz is not trained in the law and is by himself. he thereby request the Court to show leniency while interpreting this pleading. Haines v. Kerner, 404 U.S. 519.

## PETITIONER'S REQUEST FOR RELIEF AND CLAIM

Petitioner request is for this Court to Grant a Writ of Habeas Corpus, and to Declare unconstitutional and void ad initio:

(1) Pulic Law 80-772, which purported to enact Title 18 U.S.C. Act of July 25, 1948, Chapter 645, 61 Stat. et. seq. and,

(2) Section 3231 thereof, 62 Stat. 826, which purported to confer upon "the district courts of the United States... orginal jurisdiction...of all offenses against the laws of the United States."

These legislative Acts violated the Qurum Bicameral and/or Presentment Clauses mandated respectfully by Article I, § 5, Cl. 2 and 3, of the Constitution. This Federal District Court which rendered Judgment and ordered Commitment of Petitioner, under Section 3231, lacked jurisdiction. Therefore, Petitioner's Judgment and Commitment order is void ad initio. To imprison and detain Petitioner under a void judgment and commitment order is unconstitutional. Thereby, Petitioner request to be discharged from his incarceration immediately.

Additionally, Petitioner request the conviction and sentence be vacated, set aside, or corrected due to a Sixth Amendment violation when he did not receive effective assistance of counsel, and when when the guilty plea that he entered into Court was not intelligently and knowingly made.

2

## STATEMENT OF THE CASE

Baudel Ortiz pleaded guilty without the benefit of a written plea agreement to conspiracy to transport undocumented aliens within the United States for private financial gain by means of a motor vehicle in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I), (1)(B)(i)(R.22-27). The District Court sentenced him to 120 months imprisonment and three years of supervised release.

Petitioner filed a direct appeal to the Court of Appeals for the Fifth Circuit, claiming the sentence above the applicable Guidelines range to be substantively unreasonable. The sentence was affirmed.

## STATEMENT OF FACTS

The statement of facts is derived in large part from the pre-sentence report. The investigation of Petitioner and other members of his family, as well as other non-family members began with the arrest of Tyler Ross Severn near Hebbronville, Texas. With the cooperation of Severn, and other co-defendants, Petitioner and seven others were indicted in a superseding indictment. The conspiracy involved the movement of undocumented aliens from locations in South Texas to the Bryan/College Station Texas area. The government estimated something in the neighborhood of 1000 undocumented aliens had been smuggled, and Western Union records indicated approximately $800,000.00 and been wired by others to different members of the Ortiz family as payment for smuggling of their friends or loved ones. The activities of different members

3

of the conspiracy occurred between 2001 and 2008. The PSR concluded
Petitioner was the "head" of the organization. For that accusation,
Petitioner received a (4) level upward adjustment, though he
objected to that amount of adjustment. He also received a (9)
level upward adjustment for the number of aliens, and a (2) level
upward adjustment for reckless endangerment: though no one was
ever reported or found to have been hurt. Therein, Petitioner
accepted the fact that there was danger: however wanted the Court
to recognize that no one had been injured. As a result of the
upward adjustments, the applicable Guidelines range was found
to be a level 24, which corresponded to a sentencing range of
51 to 63 months in criminal history category I, as Petitioner
had no previous criminal history.

It was also found that Petitioner had left the area, moving
from Texas to Louisiana in 2005. Petitioner had things weighing
heavily on his mind. So he found a new job and moved. In Louisana
he found a Church to attend, where he had a personal encounter
with Jesus Christ. In a spiritual act of salvation, he wept with
tears flowing down his cheeks, and asked the God above for
forgiveness. From that point on, Petitioner has lived a changed
life, has not been involved in any criminal activity, has been
a good father, providing for his family. Once Petitioner left
Texas he had no involvement with anyone in Texas or from Texas.

When the Court issued its statement for the 120 months
sentence, it stated the reasons were: the length of the conspiracy,

4

the number of aliens involved, that family members were involved, that some participants continued to be involved in the conspiracy though they had previously been prosecuted, and that the aliens were transported in a way that constituted reckless endangerment. The Court believed the maximum penalty should correspond to the statutory maximum of 10 years. Additionally, the Court stated the reasons for the sentence as being to promote respect for the law, safety of the community, the nature of the offense, the history and characteristics of each defendant, to impose just punishment, and to protect the public from future criminal conduct

Finally, when the probation officer asked whether the sentence represented a guideline departure or a Booker variance, the Court stated, if the upward departure was not upheld, then it was a Booker variance, which the Court stated was based upon the record.

## CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner Ortiz, a permanent resident of the United States, faces deportation after pleading guilty to conspiracy to bring and harbor undocumented alians into the United States of America. He claims his Counsel not only failed to advise him of this consequence before he entered the plea, but also told him the Government would be fair with him, that he would receive a lighter sentence by pleading guilty rather than taking the case to trial. He alleges, he would have gone to trial had he not received this incorrect advice, and had he received advice concerning deportation.

Petitioner Ortiz, entered the United States at age 10, when his parents illegally entered. After which, his parents would not enter Ortiz into school for fear of being detected as illegal alians by the Immigration authorities. Instead, his father found work for Ortiz at construction sites, doing lite manual labor. Retaining this type of work into his teenage years, he was fortunate to learn carpentry skills. These skills provided him full-time employment into his adult life.

By the age of 17, still a minor, Ortiz had fallen in love with a young lady. They became parents when Ortiz was 17. Within two years, Ortiz and the young lady had become married, wherein Ortiz qualified for a permanent "green" card.

The Supreme Court in Padilla v. Kentucky, 599 U.S. ___(2009) No. 08-651, 03/31/2010, held "Because counsel must inform a client whether his plea carries a risk of deportation, Padilla has

6

sufficiently alleged that his counsel was constitutionally deficient."

Changes to immigration law have dramatically raised the stakes of a noncitizen's criminal conviction. While once there was only a narrow class of deportable offenses and judges wielded broad discretionary authoirty to prevent deportation, immigration reforms have expanded the class of deportable offenses and limited judges' authority to alieviate deportation's harsh consequences. Because the drastic measure of deportation or removal is now virtually inevitable for a vast number of noncitizens convicted of crimes, the importance of accurate legal advise for noncitizens accused of crimes has never been more important. Thus, as a matter of federal law, deportation is an intergral part of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes. ID. Padilla.

Strickland v. Washington, 466 U.S. 668, applies to Petitioner Ortiz' claim. Before deciding whether to plead guilty, a defendant is entitled to "the effective assistance of competent counsel." McMann v. Richardson, 397 U.S. 759, 771. It may be said that this ineffectiveness claim concerns only collateral matters. However, the Supreme Court has never distinguished between direct and collateral consequences in defining the scope of constitutionally "reasonable professional assistance" required under Strickland, 466 U.S. @ 689. The question whether that distinction is appropriate need not be considered because of the unique nature of deportation. Although removal proceedings are civil, deportation is intimately related to the criminal process, which makes it uniquely difficult

7

to classify as either a direct or a collateral consequence. Because that distinction is thus ill-suited to evaluating a _Strickland_ claim concerning the specific risk of deportation, advise regarding deportation is not categorically removed from the ambit of the Sisth Amendment right to counsel. _Padilla_, supra.

To satisfy Strickland's two-prong inquiry, Counsel's representation must fall "below an objective standard of reasonableness," 477 U.S. @ 688, and there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," _Id_. @ 694. The first constitutional deficiency, is necessarily linked to the legal community's practice and expectations. _Id._, @ 688. The weight of prevailing professional norms supports the view that Counsel for Ortiz, must advise his client regarding the deportation risk. And, the Supreme Court has recognized the importance to the client of "[p]reserving the possibility of 'discretionary relief from deportation.'" _INS v. St. Cyr_, 533 U.S. 289, 323. Thus, herein there was a deficiency. The consequences of Petitioner's plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his Counsel's advice lacking. The deportation consequence is truly clear, the duty to give correct advice is equally clear. The District Court accepting Petitioner's allegation as true, he has sufficiently alleged constitutional deficiency to satisfy _Strickland_'s first prong.

8

The second prong of Strickland pertains to the prejudice his Counsel's ineffective brought Petitioner, which rest on "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. @ 694.

Though this prong is often thought to raise the bar when proving ineffectiveness, Petitioner points to the fact that only a "reasonable probability" must be met.

Petitioner proclaims, and attaches his Affidavit, Exhibit I, declaring he would not have entered a guilty plea had he known he would be deported upon that plea. He recognizes his permanent status to residency due to his permanent green card. He was still married, the father of five, was employed full-time in Louisana, working construction. With the knowledge that he would be deported upon pleading guilty, he would have chosen to go to trial instead.

To say the least, there's a hugh difference in a Hearing where a defendant pleads guilty and a trial proceeeding. The outcome of a trial rest upon a number of unknowns. For the Court's consideration, Petitioner will do his best to state factual information that would have been made manifest in a trial.

Taking the Case to trial, Petitioner would not have been award a reduction in the Guideline's Offense Level for acceptance of responsibility. During the time period which Petitioner was accused of joining the alleged conspiracy, Petitioner had been avoid his wife and one of his uncles, who was involved in the conspiracy. Their marital unfaithfulness was the reason for this avoidance.  Contrary to the statements by co-defendants in the

9

PSR, Petitioner was not a leader in the alleged conspiracy: which
he would be able to prove to the Court and Jury during the course
of a trial.

During the trial, co-defendants that had made accusations
about Petitioner would be cross-examined, being placed into a
confrontational, advisorial position. As the Court is quite aware,
it is under those conditions, the truth is more often exposed,
as to situations where accusations are made, printed in a presentence
report, then used as fact. Thereby, Petitioner believes a trial
would have provided a proceeding wherein he would not have been
found to be the leader of the alleged organization (conspiracy).

Additionally, a trial would have provided a means for the
Court and Jury to discover that Petitioner had been denied an
elementary/secondary education by his father, that his father
and uncles had been bringing undocumented alians into the United
States prior to talking to Petitioner about their illicit scheme,
and that the illicit scheme continued to operate without Petitioner,
as he had left the area, moved to Louisana to start a new life
because his heart and thinking had been changed when he had an
encounter with Jesus Christ.

Finally, during a trial, the money trail, the proceeds from
an illicit scheme, would have been made manifest. This would have
revealed that members of the alleged conspiracy, or organization,
were actually working for their own renumeration. That is to say,
there was not a profit which was then divided between anyone,
including Petitioner. These and additional facts would have given
proof that Petitioner was not a leader in the alleged conspiracy.

A trial would also give opportunity for Petitioner to defend himself from being found to have intentionally or recklessly created a substantial risk of death or serious bodily injury to another person, pursuant to U.S.S.G. §§ 1B1.3 and 2L1.1(b)(6). These findngs were found to be present with other co-defendants A trial would have given Petitioner the 6th Amendment Constitutional right to aggressively defend those charges against himself, and for those that had made such accusations, accusing him of endangering others by placing undocumented alians in the same compartment of a horse trailer with a horse, to be confronted with cross-examination. Petitioner decares he never placed anyone in a horse trailer, in the same compartment, with a horse.

It is for these aforementioned reasons, Petitioner received Ineffective Assistance of Counsel. Thus, the conviction and sentence against him should be vacated, set aside, or corrected.

### CLAIM OF A DUE PROCESS VIOLATION WHEN PETITIONER UNKNOWINGLY And Unintelligently Made His Plea

Before the Plea Hearing, Petitioner had been told by his Counsel that he was facing a sentence of imprisonment of 63 months. At the same time, Petitioner was not told he would be deported as a result of pleading guilty.

At the Plea Hearing, Petitioner remembers the Court telling him that the crime he was accused of commiting carried a statutory maximum of ten years (120 months). This information was in conflict with what his Counsel had told him: so having met with Counsel previously, thinking Counsel was working for him, protecting his

best interest, Petitioner continued to believe he would be sentenced
to 63 months at the most.

A plea of guilty must, as a matter of due process, be a
voluntary, knowing, and intelligent act. See e.g., Brady v. United
Sates, 397 U.S. 742, 747-48, Boykin v. Alabama, 395 U.S. 238,
242: Patton v. United States, 281 U.S. 276 (1930). To constitute
an intelligent act, it must be "'done with sufficient awareness
of the relevant circumstances and likely consequences.'" McMann
v. Richardson, 397 U.S. 759, 766 (1970). In Barbee v. Ruth, 678
F.2d @ 635, (1990) the Fifth Circuit found "The consequences of
a guilty plea, with respect to sentencing, mean only that the
defendant must know the maximum prison term and fine for the offense
charged." But, in the Case, Petitioner was left unintelligent,
confused, his Counsel told him 63 months. When making his plea
the statutory maximum would not apply to him, so he thought, because
his Counsel had told him 63 months.

Petitioner had been told that if he plead guilty there would
be advantages. The Government would be kinder. He believed he
would then not face the maximum possible sentence. Afterall, he
was saving the Government the expense of going to trial, he was
making a deal with the Government so to speak. His Counsel had
informed Petitioner that there was a Guideline's system, and from
that system he would face 63 months, not a statutory maximum.
In fact, Petitioner was unintelligent of what the "statutory"
actually meant, since he had only heard of the Guideline's system.
The Fifth Circuit found the defendant, who was informed that he
was facing 63 months, was left unknowing and unintelligent, so
his plea was vacated. See United States v. Rumery, 698 F.2d 674.

12

Lastly, Petitioner did not know that after pleading guilty additional accusations would be brought against him, and then used to increase his sentence. He did not know, statements printed in a presentence report would be used to find him a leader of the alleged conspiracy, and guilty of causing a risk of serious bodily injury. He did not know that these witnesses, whom did not appear during any proceeding, instead their statements were placed in the presentence report and used against Petitiioner at sentencing, in direct violation of the Sixth Amendment. See Crawford v. Washington, 124 S.Ct. 1354 (2004)("The Sixth Amendment of the Constitution provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him. The Constitution guarantees a defendant a right to confront those who bear testimony against him. A witness' testimony against a defendant is thus inadmissible unless the witness appears at trial or if the witness is unavailable, the defendant had a prior opportunity for cross-examination.")

Wherefore, Petitioner did not know that he would not be able to confront witnesses against him at the sentencing hering, did not know his Counsel telling him, he "was facing 63 months" with a plea of guilty, was not correct, and did not know additional alleged facts would be used to increase the imposed sentence; thereby his guilty plea was made unknowingly and unintelligently and should be vacated. And was did not have "sufficient awareness of the ...Likely consequence," of deportation. McMann, supra @766.

### CLAIM OF SIXTH AMENDMENT VIOLATION WHEN FACTS WERE USED AGAINST PETITIONER TO INCREASE HIS SENTENCE WHERE THOSE FACTS WERE NOT FOUND BY A JURY OR ADMITTED BY PETITIONER

The United States Supreme Court held in Shepard v. United States, 2005 U.S. Lexis 2205 (3/07/05) that in the case of a guilty plea, "any fact other than a prior conviction used to increase the sentence must be found by a jury or admitted by the defendant." In Blakely v. Washington, 159 L.Ed.2d 403 (2004) the Court held the Sixth Amendment prohibits imposition of a sentence above the legally prescribed maximum based on a fact or facts neither admitted by the defendant nor found by a jury beyond a reasonable doubt. The legally prescribed maximum means the "maximum sentence the judge may impose solely on the basis of facts reflected in the jury's verdict or admitted by the defendant." The Court in United States v. Booker, 160 L.Ed.2d 621 (2005), in holding the guidelines to be advisory and not mandatory, affirmed the Courts with discretion when imposing a sentence.

With all due respect to the Court, it appears from the aforementioned cases, the Supreme Court continues to hold fast to the use of the Sixth Amendment protection that all facts used to imprison or increase the imprisonment must be found by a jury or admitted by the defendant.

Petitioner never admitted to being a leader of the alleged organization (conspiracy) nor to endangerment, to cause a risk of serious bodily injury. The Court found these allegations in the presentence report, accepted them as the truth, then used them

to increase Petitioner's sentence. The court had discretion when it imposed the sentence, but as the Supreme Court has made clear, the Court could not find these facts without a jury and without Petitioner admitting to them. (Of note, Petitioner moved to Louisiana in 2005, but the conspiracy he allegedly was a "leader" of continued until August 17, 2008. (According to the Judgment In A Criminal Case, February 6, 2009.)

In Ring v. Arizona, 536 U.S. 584, 592-93, the Supreme Court applied Apprendi to an Arizona law that authorized the death penalty if the judge found one of ten aggravating factors. The Court found defendant's constitutional right had been violated because the judge had imposed a sentence greater than the maximum he could have imposed under state law without the challenged factual finding. Id. Ring, @ 602("'the maximum he would receive if punished according to the facts reflected in the jury alone'",) Apprendi, 530 U.S. 466, 490 (2000); Harris v. United States, 536 U.S. 545, 563 (2002). In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findins. When a judge inflects punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment." See 1 J.Bishop, Criminal Procedure 87, p. 55 (wd [*11] ed. 1872).

WHEREFORE, for the aforementioned reasons, Petitioner's Sixth Amendment right to have facts used against him to increase his sentence, was violated when those facts were not admitted to by Petitioner nor found by a jury, the conviction and sentence should be vacated, set asise, or corrected.

## CLAIM OF JURISDICTIONAL VIOLATION

Petitioner claims, the text of the Bill, H.R. 3190 as amended, which became Public Law 80-772 (enacting Title 18 United States Code, including Section 3231) was passed only by the Sentate and never passed by the House of Representatives. The Bill was never certified as required, and was signed by the Speaker of the House and President pro-tempore of the Senate, under purported authority of a concurrent resolution agreed to by a Congress, which interestingly had been denounced by President Harry S. Truman as a "body dominated by men with a dangerous lust for power and privilege," 27 Encyclopedia Americana 175 (2005), without Quorums of the respective Houses sitting. That Bill was mistakenly signed by President Truman, after the Bill was misrepresented to him, by solitary Officers, as a Bill passed by both Houses, which was imposssible because no Congress was in session.

For these reasons, Public Law 80-772, which was to enact Title 18 U.S.C., Act of June 25, 1948, Chapter 645, 62 Stat. 683 et seq. and Section 3231 thereof, 62 Stat. 826, purporting to confer "the district courts of the United States...original jurisdiction...of all offenses against the laws of the United States," violates Article I, § 5, Cl. 1, and Article I, § 7, Cl. 2 and 3, and are therefore Unconstitutional and void ad initio. As a result, the District Court, which acted against Petitioner, did so without jurisdiction. The judgment and commitment order are void ab initio, and the incarceration is unconstitution and unlawful.

## CONSTITUTIONAL AND STATUTORY PROVISIONS

Article I, § 2, commands and declares that "all legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

Article I, § 5, Cl. 1, commands, in relevant part, that "a Majority of each [House of Congress] shall constitute a Quorum to do Bushiness," excepting thereform permission to "adjourn from day to day" and "to Compel Attendance of its Members, in such manner, and under such penalties as each House may provide."

Article I, § 7, Cl. 2, commands, in part, that "every... Resolution,  to which the concurrance of the Senate and House of Representatives may be necessary...shall be presented to the President of the United States: and before the same shall take effect, shall be approved by him, or being disapproved by him, shall be repassed by two-third of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the case of a Bill."

Title 1, U.S.C., § 106, Act of July 30, 1947, Chapter 388, Title I, Ch. 2, § 106, 61 Stat. 634, Pub.L. 80-278, provides, in part, that "when a bill...shall have passed both Houses, it shall be printed and shall then be called the enrolled bill...and shall be signed by the presiding Officers of both Houses and sent to the President of the U.S.

### H.R. 3190 IN THE FIRST SESSION OF THE 80th CONGRESS

H.R. 3190, was introduced and comitted to the Committee of

the entire House of Representatives on the State of the Union

of the First Session of the 80th Congress entitled "Crimes and

Criminal Procedure," See House Report No. 304 (April 24, 1947,

p. 1 (App. 67), also 94 Cong. Rec. D556-D557 (Daily Digest)

(Charting H.R. 3190. (App. 65-66). H.R. 3190, different from

"five...bills which...precedent it...[because] it constituted

a revision, as well as codification, of the Federal Laws relating

to Crimes and Criminal Procedure." 93 Cong. Rec. 5048-5049 (May

12, 1947)(App. 45-46). The bill was intended (1) to revise and

compile all of the Criminal Law, (2) to "restate, and consolidate"

"existing statutes." (3) to "repeal" Obsolete, supreseded, redundant

and repetitious statutes." (4) to coordiante the Criminal Code

with the "Federal Rules of Criminal Procedure" formerly enacted

and (5) to "clarify and harmonize" penalties of the "many acts"

passed by Congress which were found to be "almost identical" Id.

   "The bill was ordered to be engrossed and read a third time,

was read a third time, and passed" the House on May 12, 1947,

Id.; Journal of the House of Representatives ("House Journal").

May 12, 1947, pp. 343-344 (App. 4-5); 94 Cong. Rec. D556-D557

(showing H.R. 3190's only passage by the House of Representatives

on May 12, 1947), sent to the Senate and there "Referred...to

the Committee on the Judiciary," 93 Cong. Rec. 5121, May 13, 1947

(App. 47); Journal of the Senate ("Senate Journal"), May 13, 1947,

p. 352 (App. 10)[1]

---

[1] Senate Journal, May 13, 1947, approved by the Senate, May 14, 1947, Senate
Journal, p. 259 (App. 11), and the House Journal, May 12, 1947, approved
by the House, May 13, 1947, House Journal, p. 346 (App. 6) The Journals
of the two Houses are admissible when properly certified, 18 U.S.C. §1736

As passed and enrolled by the House of Representatives, H.R. 3190, included at Section 3231, Subtitle "District Courts," the following text:

> "Offenses against the United States shall be cognizable
> in the district courts of the United States, but nothing
> in this Title shall be held to take away or impair the
> jurisdiction of the courts of the several states under
> the law thereof."

H.R. as passed by the House of Representatives...p. 367, § 3231. (See App. 110). See United States v. Sasscer, 558 F.Supp. 33, 34 (D.Md. 1982).

July 27, 1947, Congress adjourned without the Senate passing H.R. 3190. See, Cong.Rec. 10439, 10522 (July 26, 1947) App. 48-49. Then, November 17, 1947, Congress reconvened, pursuant to a Presidential Proclamation. But, Congress again "adjourned sine die, December 19, 1947," without the Senate passing H.R. 3190. See Kennedy v. Sampson, 511 F.2d 430, 444 (App. n. 4 (D.C. Cir. 1974)).

## H.R. 3190 IN THE SECOND SESSION OF THE 80th CONGRESS

The Senate Committee on the Judiciary, reported amendments to H.R. 3190, on June 14, 1948, under Senate Rep. No. 1620, 94th Cong. Rec. 8075 (June 14, 1948)(See App. 50); Senate Journal, June 14, 1958, p. 452 (App. 34) (The Senate approved its Journal for June 14, 1948, Senate Journal, June 15, 1948, pp. 461-462, (See App. 35-36)).

Senate Rep. No. 1620, contained "a large volume of amendments," and new Federal Rules of Criminal Procedure [were] keyed to the

bill and [were] reflected in Part II of [the new proposed] Title 18." Heralding that, upon passage of the Amended Bill, "[u]ncertainty will be ended," the Senate wanted "the amendments adopted en bloc," including a new jurisdictional Section for Title 18. 94 Cong. Rec. 8721. (App. 51). The Report contained only the proposed amendments. See Sen.Rep.No. 1620, pp. 1 & 4. (App. 103-104).

"[T]he amendments were considered and agreed to en bloc" and then ordered to be engrossed." 94 Cong.Rec. 8721-8722 (June 18, 1948)(App. 51-52). Senate Journal, June 18, 1948, p. 506 (H.R. 3190), as amended, passed the Senate. (See App. 37). It was moved that "the Senate insist upon its amendments" by the House (94 Cong.Rec. @ 8722): and "[O]rdered that the Secretary request the concurrence of the House of Representatives in the amendments." See Senate Journal, supra, p. 506; House Journal, June 18, 1948, p. 688. (See App. 16).

The House received the proposed amendments. The Clerk "read the Senate amendments" collectively into the record with which the House of Representatives concurred. 94 Cong.Rec. 8864-8865 (June 18, 1948)(See App. 53-54); House Journal, June 18, 1948, p. 704 (the "said Senate amendments were concurred in")(See App. 17). Although "[t]he House of Representatives agreed to the amendments to...H.R. 3190, "Senate Journal, June 18, 1948, p. 510. (See App. 38), no action was taken on H.R. 3190 as amended. The Journal of the House of Representatives is devoid of any vote on H.R. 3190 itself on June 18, 1948, and thereafter through adjournment on June 20, 1948. Moreover, the Official Historical

Chart of H.R. 3190, clearly shows the only passage by the House of Representatives occurring on May 12, 1947; and, specifically references Volumn 93, page 5048 of the Congressional Record as the recorded date the House passed the bill, 94 Cong.Rec. D536-D557 (Daily Digest).

## CONGRESS AGREED, BY RESOLUTION, TO CONTINUE LEGISLATIVE BUSINESS BY A SINGLE OFFICER OF EACH HOUSE DURING ADJOURNMENT

June 19, 1948, the House submitted and agreed to concurrent resolutions, H.Cong.Rec. 218 and 219, and requested concurrance by the Senate. See House Journal, June 19, 1948, p. 772 (App. 19-20); Senate Journal, June 18, 1948, p. 557 (App. 39). "[T]he Senate [then] passed without amendment these concurrent resolution of the House. (The House sat from June 19, 1948, through June 20, 1948, adjourning at 6:56 am, House Journal, June 19, 1948, p. 775 (App. 21), and approved the Journal of the 19th. House Journal, July 26, 1948, pp. 792-793 (reconvention by President Proclamation)). (App. 28-29). 94 Cong.Rec.9349 (App. 57). H.Cong. Rec. 218 "provided adjournment of the two Houses of Congress until December 31, 1948." Id. Concurrent Resolution, Second Session, 80th cong.H.Con.Res. 218, June 20, 1948, 62 Stat. 1435-1438. (App. 105-106). H.Cong.Res. 219 "Authorized the signing of enrolled bills following adjournment,"94 Cong.Rec. 9349, specifically resolving:

> "That notwithstanding the adjournment of the two
> Houses until December 31, 1948, the Speaker of the
> House of Rresentatives and the President Pro Tempore
> of teh Senate, be, and they are hereby, authorized
> to sign enrolled bills and joint resolutions duly
> passed by the two houses and found truly enrolled."

See Concurrent Resolutions, supra; H.Con.Res. 219, 6/20/1948, 62 Stat. 1436.

Congress did adjourn on June 20, 1948 pursuant to H.Cong.Res. 218, 94 Cong.Res. 9348, 9169 (App. 55-56); House Journal, June 20, 1948, p. 578. (App. 40). Both Houses reconvened on July 26, 1948, pursuant to a Proclamation by President Truman. Senate Journal, July 16, 1948, p. 593 (showing reconvention); House Journal, July 26, 1948, p. 792-793 (same); House Journal approved July 27, 1948. (App. 30), and the Senate Journal approved on July 37, 1948, p. 593. (App. 44)

### POST ADJOURNMENT SIGNING OF H.R. 3190 BY SINGLE OFFICERS OF THE HOUSES AND PRESENTMENT TO AND APPROVAL THEREOF BY THE PRESIDENT, PURSUANT TO H.CON.RES. 219

With both Houses adjourned, with no quorum, disassembled and dispensed, Mr. LaCompte, Chairman of the Committee on House Administration, reported that the Committee had found H.R. 3190 "truly enrolled." See House Journal, legislative day of June 19, 1948, p. 778 (recorded under heading "BILLS AND JOINT RESOLUTIONS ENROLLED SUBSEQUENT TO ADJOURNMENT")(App.22) Mr. LaCampte's announcement was reported upon reconvention by the President's Proclamation, July 26, 1948, 94 Cong.Res. 9363. (App. 60)

Mr. LaCompte attached his certificate of enrollment to the original H.R. 3190, passed by the House May 12, 1947. (See H.R. 3190, certified after adjournment as "truly enrolled" as certified by Richard H. Hunt, Director, Center For Legislative Archives, The National Archives, Washington, DC)(App. 107-113).

Although never certified as truly enrolled, the Speaker of the House of Representatives and the President Pro Tempore of the Senate, respectfully signed the Senate's amended H.R. 3190 on June 20 and 23, 1948. See 94 Cong.Rec. 9353-9354 (App. 58-59); House Journal, legislative day June 19, 1948, p. 777 (App. 23); Senate Journal, legislative day June 18, 1948, p. 578-579 (App. 40-41); National Archives & Records Adm. Certl, H.R. 3190 signed by House Senate Officers and President Truman (App. 114-117).

The Senate amended H.R. 3190, was then presented by the Committee on House Administration to President Truman, June 23, 1948, who signed it June 25, 1948, 12:23 E.D.T. Cong. Rec. 9364-9367 (App. 61-64); House Journal, legislative day of June 19, 1948, p. 778, 780-782 (App. 24, 25-27); Senate Journal, legislative day of June 18, 1948, p. 579, 583 (App. 41, 43); National Archives & Records Adm. Cert., H.R. 3190, supra, 94 Cong.Rec. D557 (Daily Digest).

That same day, President Truman signed into Law, Public Law 80-773, enacting into positive Law, Title 28 U.S.C. Act June 25, 1948, Ch. 646 §1, 62 Stat. 869. That Act positively repealed the former criminal jurisdiction granted to the district courts. Id. §39 et seq. 62 Stat. 991, et seq, (positive repeal listing former 28 U.S.C. §41, ¶2 in schedule of repealed statutes.

### THE SIGNATORIES OF H.R. 3190 KNEW
### THE ENACTING CLAUSE WAS FALSE WHEN SIGNED

Public Law 80-772, stated the enactment "by the Senate and House of Representatives of the United States of America in Congress assembled." See National Archieves & Records Adm. Cert. H.R. 3190 as signed into Public Law 80-772, supra. Each signatory knew

that neither "House" legislatively existed at that time, and the legislative process had ceased within the terms of Article 1, §§ 5 & 7, on June 20, 1948.

### PUBLIC LAW 80-772 IS UNCONSTITUTIONAL AND VOID BECAUSE H.R. 3190 NEVER PASSED BOTH HOUSES AS REQUIRED BY ARTICLE 1, SECTION 7, CLAUSE 2

This Case presents the "profoundly important issue," of the constitutionality of an Act of Congress, "of such public importance as to justify deviation from normal appellate practice and to require immediate determination by this court." See Clinton v. City of New York, 524, 417, @439 & 455; adopting language from INS v. Chadha, 462 U.S. 919, 929 (1983).

Although "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representative." (Art. I, § 1, U.S. Constitution). "When [Congress] exercises its legislative power, it must follow the 'single finely wrought and exhaustively considered procedures' specified in Article I." Metro. Washington Airport v. Citizens for Abatement of Aircraft Noise, Ins., 501 U.S. 252, 274 (1991)(quoting INS, supra @ 951. An Act of Congress "does not become a law unless it follows each and every procedural step chartered in Article I § 7, Cl. 2, of the Constitution." Landgraf v. USI Film Products, 511 U.S. 244, 263 (1994)(citing INS and Clinton, supra. noting requisite "steps" taken before bill may "become a law" and holding that a procedurally defective enactment cannot "become a law" pursuant to the procedures designed by Article I, § 7, of the Constitution.")

The Constitution requires "three procedural steps: (1) a
bill containing its exact text was approved by a majority of the
Members of the House of Representatives; (2) the Senate approved
precisely the same text, and (3) that text was signed into law
by the President. If one paragraph of that text has been omitted
at any one of those three steps [the] law [in question] would
not have been validly enacted. Clinton, 524 U.S. @ 448.  "All
legislative Powers herein granted shall be vested in a Congress
of the United States, which shall consist of a Senate and House
of Representatives." Art. I, § 1. [A] Majority of each [House]
shall constitute a Quorum to do business..." Art. I, § 5, Cl.1.
Every Bill which shall have passed [both Houses], shall before
it becomes a Law, be presented to the President of the United
States: If he approves he shall sign it..." Art. I, § 7, Cl.2
"Every...Resolution...to which the Concurrence of [both Houses]
may be necessary (except on a question of Adjournment) shall be
presented to the President of the U.S.; and beofre the same shall
take effect, shall be approved by him..." Art. I, § 7, Cl.3.

The text of H.R. 3190 passed by the House of Representatives
was the text that existed on the date of passage, May 12, 1947.
Whereas, the text of the Bill passed by the Senate, June 18, 1948,
was H.R. 3190, "as amended." Senate Journal, June 18, 1948, p.
506. Thus, the text of the Bills passed by the respective Houses
were grossly different and neither Bill ever "became law." Clinton,
524 U.S. @ 448.

PERMITTING POST-ADJOURNMENT LEGISLATIVE BUSINESS PURSUANT
H. CON. RES. 219, VIOLATED THE QUORUM BICAMERAL AND
PRESENTMENT REQUIREMENTS OF ARTICLE I OF THE U.S. CONSTITUTION

After Congress adjourned, June 20, 1948, pursuant to H.Con.Res.
219, a single Officer of each House of Congress signed a Bill,
purported to be H.R. 3190, June 22-23, 1948. 94 Cong. Rec. 9354;
House Journal, legislative day of June 19, 1948, p. 777; Senate
Journal, legislative day of June 18, 1948, p. 578-579. And,
presented that Bill to the President, who signed it, June 25,
1948. 94 Cong.Rec. 9365-9367. Thus, the post-adjournment signature
"provision [of H.Cong.Res. 219] was an important part of the
legislative scheme," leading to the enactment of Public Law 80-
772, without which it would never have "become a law." Bowsher
v. Synar, 478 U.S. 714, @ 728 (1986). Public Law 80-772, falsely
stated it was "enacted" while both Houses were "in Congress
assembled" when in fact Congress was not in Session. See NATIONAL
ARCHIVES & RECORDS ADM. CERT. H.R. 3190, as signed into P.L. 80-772.

The Bill, signed was the Senate's amended H.R. 3190. A Bill
never certified as "truly enrolled," compare to Pub. L. 80-772.
Enrollment Clause and signature pages with H.R. 3190, certified
as "truly enrolled," supra, and H.Con.Res. 219, never authorized
the signing of unenrolled bills after adjournment. See H.Con.Res.
219 supra, 69 Stat. 1436.

Article I, § 5, Clause 1 mandates a Quorum of both Houses
of Congress "to do Business." This constitutional requirement
.has been enforced by practice Rule and the House, custom,
Supreme Court holdings and duly enacted statutes.

26

1 U.S.C. § 101, requires every "enacting clause of all Acts of Congress" to state: "Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled." Although the bill after passage by "both Houses" must be "enrolled" following which it shall be signed by the presiding officers of both Houses and sent to the President of the United States."(1 U.S.C. 106 contains an exception for enrollment "[d]uring the last six days of a Session," but no exception for enrolling, signing, or presenting a bill to the president otherwise than during the sitting of both Houses.)

1 U.S.C. § 106, the actual procedure, is regulated by House Rules and established practice. Following passage the "Chairman of the Committee on House Administration...affixes to the bills examined, a certificate that the bill has been found truly enrolled. Formerly, the "Chairman of the Committee on Enrolled Bills," performed this critical task in the legislative business of enacting a bill, which has always required the enrolled bill to be "placed before the House and signed by the Speaker." See House Doc. No. 355, 59th Cong. 2nd Sess., Hinds' Precedents of the House of Representatives, Chp. XCI, § 3429, n. 3 & 5, p.311 G.P.O. 1907) (App. 92); See House Doc. No. 769, supra, Preface, p. vi ("The rulings of the Speaker of the House and of the Chairman of the Committee of the whole, are to the rules of the House, what the decisions of the courts are to the statutes... ⌊which are⌋ embodied in the monumental work⌊s⌋ of Hinds and

Cannon.")

House Doc. No. 769 supra, Stages of a Bill, § 963, No. p. 483 (App. 79), after which the "enrolled bill is first laid before the House of Representatives and signed by the Speaker... after which it is transmitted to the Senate and signed by the President of that body." Id. No. 17, p. 484 (App. 80) The Supreme Court takes notice of the legislative history of a bill, Alaska v. American Can Co., 358 U.S. 224, 226-27 (1959), and will judicially "hold" Congress and its legislative committees "to observance of its rules." Yellin v. U.S., 374 U.S. 109, 114 (1963). The Supreme Court in Marshall Field Co. v. Clark, 143 U.S. 649 (1892) defined the essence of this procedure:

> The signing by the Speaker of the House of Representatives, and by the President of the Senate in open session, of an enrolled bill is an official attestation by the two Houses of such bill as one that has passed Congress. It is a declaration by the two Houses, through their presiding officers, to the President, that a bill, thus attested, has received, in due form, the sanction of the legislative branch of the government, and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him.

140 U.S. @ 672. 1 U.S.C. § 106, codified this constitutional requirement, reading 1 U.S.C. § 101 and § 106 together, requires that all acts must occur at least through presentment to the President while Congress is in session; that the enrolled bill must be "layed before the House" prior to signing by the Speaker and then "transmitted to the Senate" before the signing by the president of that body concludes that the respective Houses must

be in Session during this transaction. "[T]he Constitution has
LEFT IT TO Congress to determine how a bill is to be authenticated
as have passed" and the courts accept as passed all bills
authenticated in the manner provided by Congress." U.S. v. Munoz-
Flores, 495 U.S. 385, 391 n. 4 (1990)(citing Field & Co. v. Clark,
143 U.S. 649 (1892), in which case the court established the so-
called enrolled bill rule-a rule not applicable in this case,
but a ruling that supports petitioner's claim.)

    An "adjournment terminates the legislative existence of
Congress." Pocket Veto Case, 279 U.S. @ 881. "The expression,
a "house" or "each house" [when] employed...with reference to
the faculties and powers of the two Chambers...always means...the
constitutional quorum, assembled for the transaction of business,
and capable of transacting business." 279 U.S. @ 683, quoting
Constitutional History of the United States, 486 n. 1. Moreover,
the term "House" means "the House in session," 279 U.S. @ 682,
and "as orginized and entitled to exert legislative power," that
is, the bodies organized comformably to law for the purpose of
enacting legislation." Id. (quoting Missouri Pacific Co. Kansas,
248 U.S. 276, 281 (1819); Also, House doc. 355, supra Hinds
precedents, § 2930, p. 87 "The House is not a House without a
quorum." (App. 87)

    No "attestation" or "declaration by the two houses...to the
president," Field & Co., 143 U.S. @ 672, that H.R. 3190, had
"Passed" Congress during the adjournment was impossible because
no such "Houses" constitutionally existed. See  United States
National Bank of Oregon v. Independent Insurance Agents of Am.,

508 U.S. 439, 455 n.7 (1993)(noting that the rule established
in Field & Co., 143 U.S. @ 672, made statutory by 1 U.S.C. §106,
turned upon "the 'enrolled bill,' signed in open session by the
Speaker of the House of Representatives and the President of the
Senate.") Long standing precedence of the House affirms this.
House doc. No. 353, supra, Hinds Precedents, Vol. IV. § 2951,
p. 90-91 (Upon "disclosure...that there is not a quorum...the
House thereby becomes constitutionally disqualified to do further
business").(Excepting from disqualification the exceptions state,
in Art. I, § 5, Cl. 1)(App. 88-89); Id. § 3548, p. 322 ("The
Speaker may not sign an enrolled bill in the absence of a quorum.")
(App. 93); Id @ § 3486, p. 332-333 (Recognizing enrollment and
presentment to the President to be legislative business required
to be completed before adjournment.)(App. 95-96); @ § 3487, p.
333, n. 3 (Presentment to the President is legislative business
which must be compled before adjournment.)(App. 96); Id @ § 4788,
p. 1026 ("The presentment of enrolled bills to the President of
the United States is a 'transaction' of 'business' of the 'House'").
(App. 100).

Once a bill has passed the House of Representatives it must
be printed as an 'engrossed bill' which then "shall be signed
by the Clerk of the House, sent to the other House, and in that
form shall be dealt with by that House and its Officers, and,
if passed, returned signed by said Cler." 1 U.S.C. § 106. In the
immediate H.R. 3190, it was passed by the House of Representatives,
May 12, 1947, engrossed, sent to the Senate and there referred
to the Senate Committee on the Judiciary. See 93 Congress Rec.

30

5048-5121; Senate Journal, May 13, 1947, p. 252. However, the Bill, H.R. 3190, was not dealt with, nor passed "in that form."

Instead, amendments were proposed which were "agreed to en bloc," read into the Record and "ordered to be engrossed." 94 Cong. Rec. 8721-8722. Then, "The [amended] bill was read a third time and passed." 94 Cong. Rec. 8722, Senate Journal, June 18, 1948, p. 506. The House then concurred in the amendments en bloc. 94 Cong. Rec. 8864-8865; House Journal, June 18, 1948, p. 704. This contravenes the procedures of the House of Representatives for the 80th Congress. "When a bill with Senate Amendments comes before the House, the House takes up each amendment by itself..." House House Doc. No. 769, Stages of a bill in the House. § 983, No. 13, p. 483.

"The House in which a bill originates, enrolls it." House doc. No. 769, supra. Stages of a Bill No. 15, p. 483, (App. 79). And, in the case of House bills, the "chairman of the Committee on House Administration...affixes to the bills examined a certificate that the bill has been found truly enrolled." Id. No. 16, p. 483. After which it is "laid before the House...signed by the Speaker [then] transmitted to the Senate and signed by the President of that body." Id. No. 17, p. 484. Unequivocally, "The Speaker may not sign an enrolled bill in the absence of a quorum." House Doc. no. 355, supra, Hinds' Precedents, § 3458, p. 322, CF., Id, § 2939, p. 87 (The House is not a House without a quorum.)

The Constitutional "quorum" issue is precluded from the Field & Co.s enrolled bill rule" by its terms, i.e. "the signing...in open session of an enrolled bill." 143 U.S, @ 672, Which in any case only applies in "the absence of a constitutional requirement binding Congress." United States v. Munoz-Flores, supra, 495 U.S. @ 391, n. 4. Moreover, just as §7, gives effect to all of its Clauses in determining what procedures the Legislative and Executive Brances must follow to enach a Law, (Id. 495 U.S. 386) so does Article I, § 5, Cl. 1, "provide that no law could take effect without the concurrence of the proscribed majority of the members of both Houses." INS v. Chadha, 462 U.S. @ 949-950, as to all legislative Business. Cf. United States v. Ballin, 144 U.S. 1, 3-5, (1892)(To determine whether constitutionally mandated quorum was present for legislative action the Court "assumes the Journals of the Houses are to be considered to decide the issues.)

The Bill, signed by the Officers of the Houses, presented to and signed by the President of the United States was the Senate's amended bill, which never passed the House. H.Con.Res. 219 only "authorized [the] sig[ing] [of] Con. Res. 219, supra, 62 State. 1436, voiding the signature of the amended bill.

On July 26, 1948, "Mr. LaCompte, from the Committee on House Administration, reported that that Committee had examined and found," H.R. 3190 had been "truly enrolled." 94 Cong.Rec. 9363. The version of H.R. 3190 certified as "truly enrolled" by Mr. LaCompte, is the House version passed on May 12, 1947, with the text of the original § 3231-the text of which was never passed

by the Senate-to which his certificate of enrolled is attached.
(App. 107-113). The statutory mandate, after final passage and
printing to "call" the bill in such final form, "the enrolled
bill." 1 U.S.C. § 106. Act of July 30, 1947, Chp. 388, Chp. 2,
61 Stat. 634, is determined by the Certificate "affixed to the
bill." House Doc. No. 769, Stages of a bill, supra, No. 16, all
of which is required before the signing by the presiding Officers
of both Houses and sending to the President of the United States.
1 U.S.C. § 106.

Having not been enrolled, certified as truly enrolled, or
signed by the Speaker of the House with a quorum present, the
Bill was rendered Constitutionally void. House Doc. No. 769, supra,
Constitution of the United States, § 55, p. 19. ("When action
requiring a quorum was taken in the ascertained absence of a quorum
...the action was null and void.") (App. 74). House Doc. No. 355,
supra, Hind's Precedents, §§ 3497, 3498, p. 344-345 (Such a bill
is "not in force" and is "not a valid statute.") (App. 97-98).
Cf., Id. Hind's Precedents, § 2962, p. 94 (To vacate legislative
act" the absence of a quorum should appear from the Journal.")
(App. 90).

Art. I, § 7, mandates that a bill has passed both Houses
"shall before it becomes a law, be presented to the President
of the United States..." Art. I, § 7, Cl. 2; INS v. Chadha, 462
U.S. @ 945, (Which "can only contemplate a presentment by the
Congress in some manner, [because]...at that point the bill is
necessarily in the hands of the Congress." See United States v.
Kapsalis, 214 F.2d 677, 680 (7th Cir. 1954), cert denied, 349

U.S. @ 906 (1955). Thus, presentment is clearly part of the legislative procedure required as essential to enactment of a bill as law. INS, supra @ 947, 951; LaArba Silver Mining Co. v. United States, 175 U.S. 423, 454 (1899)("After a bill has been presented to the President, no further action is required by Congress in respect of that bill, unless it be disapproved by him...") See House Doc. No. 355 supra, Hind's Precedents, Vol. IV, § 4788, p. 1026 (Recognizing "the presentation of enrolled bills" to the Presidnet is a transaction of "Business" of "The House.") Id. § 3487, p. 333, n. 3 (When a bill is enrolled or signed by presiding Officers "too late to be presented to the President before adjournment," signing and presentment must continue at the next session as a "resumption of [legislative] business.") Clearly, presentment is part of the constitutionally mandated "Business," Art. I, § 5, Cl. 1, to be "exercised in accord with [the] single, finely wrought and exclusively considered, procedure" "porcribed...in Art. I, § 1 & 7." INS v. Chadha, @ 951.

The "draftsmen" of the Constitution "took special pains to assure these [legislative] requirements could not be circumvented. During the final debates on Art. I, § 7, Cl. 2, James Madison expressed concern that it might easily be evaded by the simple expedience of calling a proposed 'resolution' or 'vote' rather than a 'bill.' As a consequence, Art. I, § 7, Cl. 3...was added." INS v. Chadha, @ 947 (citing 2 Farrand, supra, 301-302, 304-305).

Whether actions authorized under a resolution are "an excercise of legislative powers, depends not on their form, but

upon "whether they contain matter which is properly to be regarded as legislative in its character and effect." INS, supra, @ 952 (quoting S.Rep. 1335, 54th Cong. 2nd Sess., 8 (1897)).

If the power is legislative, Congress must exercise it in fonformity with the bicameralism and presentment requirements of Art. I, § 7." Metropolitan, 501 U.S. @ 276; also Bowsher v. Synar, 478 U.S. @ 756 (Stevens, J., concurring)(It is settled, however, that if a resolution is intended to make policy that will bind the Nation, and thus is, legislative in its character AND EFFECT," (S.Rep. No. 1335, 54th Cong., 2nd Sess., 8 (1897), then the full Article I requirements must be observed, for "the nature of substance of the resolution, and not its form, controls the question of its disposition." Ibid.)

"Congress," of course "cannot grant to an officer under its control what it does not possess." Metropolitan, supra @ 275 (quoting Bowsher v. Synar, supra @ 726.) Congress does not possess the "capability of transacting business" and is not "entitled to exert legislative power," when its "legislative existance" has been "terminated" by an "adjournment." Pocket Veto Case,supra, @ 681-683. The limitation of the power of less than a quorum is absolute." Hind's Precedents, Vol. V. Chp. CXL, § 6686, p. 851 (App. 102). And, includes the signing of an enrolled bill by the Speaker of the House, Id. Vol. IV, Chp. XCL, § 3458, p. 322, and presentment to the President of the United States. Id. Chp. XCII, §§ 3486-3487, p. 332, 333, n.3, 344 & 345. (App. 95-98). Wright v. United States, 302 U.S. 583, 600 (1938)(Stone, J., concurring) ("The Houses of Congress being collective bodies, transacting

their routine business by majority action, are capable of acting only when in session and by formal action recorded in their respective journals, or by recognition, through such action, of an established practice.") Thus, "Congress" as defined by the Constitution and Supreme Court, never "presented any version of H.R. 3190 to the President of the United States.

Whether the action taken under H.Con.Res. 219, was an exercise of legislative power, depends upon whether it was essentially "legislative in purpose and effect." INS v. Chadha, supra @ 952. "In short, when Congress, [takes] action that has the purpose and effect of altering the legal rights, duties, and relations of persons...outside the Legislative Branch, it must take that action by the procedures authorized in the Constitution." Metropolitan, supra @ 276, quoting INS v. Chadha, @ 952-955. (If Congress chooses to use a resolution...as a means of expediting action, it may do so, if it acts by both Houses and presents the resolution to the President. Consumer Engergy Council of America v. F.E.R.C., 673 F.2d 425, 476 (D.C. Cir. 1982), Affid mem, sub nom., Process Gas Consumers Group v. Consumer Engergy Council of America, 463 U.S. 1216 (1983).

The inescapable conclusion, as to the "purpose and effect" of H.Con.Res. 219, was to enact a bill, the text of which at the time of adjournment on June 20, 1948, had not been passed by both Houses, enrolled, certified as "truly enrolled," or signed by the Officers of the Houses, or presented to the President of the United States, with quorums sitting. In other words, H.Con.Res. 219, Unconstitutionally permitted post-adjournment legislative

business to proceed without Congress and upon an unpassed bill.
Congress did not follow the procedures of Art. I, § 7, Cl. 2,
and attempted to supercede the quorum requirements of Art. I,
§ 5, Cl. 1, with a concurrent resolution to carry forth legislative
business with no legislature. The 80th Congress surreptitiously
provided a bill, the text of which never passed either House
"mask[ed] under the indirect measure, (Metropolitan, supra, @277)
(quoting Madison, The Federalist, No. 48, p. 334 (J. Cooke, 1961
ed.)) of a resolution  purporting to authorize continuing
lesislative action during an adjournment with no quorum and no
Congress of an extra-congressional bill. Public Law 80-722, did
not "become a Law" as required by the Constitutional procedures
mandated under Article I, § 5, Cl. 2, and Article I, § 7, Cl.
2 and 3, and is Unconstitutional and Void Ab Initio.

"[W]hen action requiring a quorum was taken in the ascertain
absence of a quorum...the action [is] null and void." House Doc.
No. 769, supra, Vol. IV, § 2964, "A bill...not actually passed
[although] signed by the President [is to be] disregarded [requiring]
a new bill [to be] passed." House Doc. No. 769, § 103, p. 34,
Hind's Precedents, Vol. IV, § 3493)(App. 75).

THE DISTRICT COURT ORDERS COMMITTING PETITIONER TO
EXECUTIVE CUSTODY PURSUANT TO § 3231 (OF THE UNCONSTITUTIONAL
PUBLIC LAW 80-772) WERE ISSUED ULTRA VIRES
ARE UNCONSTITUTIONAL AND CORAM NON JUDICE
HIS IMPRISONMENT IS UNLAWFUL

The challenge in this Case, goes to the subject-matter jurisdiction of the District Court and hence its power to issue the orders. United States v. Catholic Conference v. Abortion Rights Mobilization, Inc., 487 U.S. 72, 77 (1988), committing Petitioner to imprisonment in Executive custody. Thus, the "quorum is, whether...[the district court] action is judicial or extra-judicial, with or without the authority of law to render [the] judgment, Rhode Island v. Massachuetts, 37 U.S. (12 Pet.) 657, 718 (1838), and, to issue the commitment orders in this Case.

Subject-matter jurisdiction means "the courts statutory or constitutional power to adjudicate the case." U.S. v. Cotton, 535 U.S. 625, 630 (2002), quoting Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 89 (1998); Rhode Island, supra @ 268 (1891)("Jurisdiction may be defined to be the right to adjudicate concerning the subject matter in a given case.") "Subject-matter limitations on federal jurisdiction serve institutional interest by keeping the federal courts within the bounds of the Constitution and Congress have prescribed." Rubrgas AG v. Marathon Oil Co., 536 U.S. 574, 583 (1999). "Federal Courts are courts of limited jurisdiction...jurisdiction of the lower federal courts is further limited to those subjects encompassed within a statutory grant of jurisdiction." Ins. Corp. of Ireland Ltd. v. Compagnie des Bauxite de Guinea, 456 U.S. 694, 701 (1982);

Kline v. Bureke Constr. Co., 260 U.S. 226, 234 (1922)(All lower federal courts "derive their jurisdiction wholly from the authority of Congress.): U.S. v. Hudson & Goodwin, 11 U.S. 32, 33 (1812) (Federal courts "possess no jurisdiction but what is given to them by the power that creates them."); U.S. v. Hall, 98 U.S. 343, 345 (1879)(Federal "courts possess no jurisdiction over crimes and offenses...except what is given to them by the power that created them.") Hudson & Goodwin, supra @ 33-34, & U.S. v. Wiltberger, 18 U.S. 76, 95-105, "Criminal statutes are to be construed strickly, probability cannot serve to enlarge a statute and an offense not clearly within the terms of a statute precludes federal court jurisdiction."

"Without jurisdiction, the court cannot proceed at all in any cause...and when it ceases to exist, the only function of the court is that of announcing the fact and dismissing the cause." Steel Co. v. Citizens, 523 U.S. @ 94, quoting Ex parte McCardle, 74 U.S. (7 Wall) 506, 514 (1869); Willy v. Coastal Corp., 503 U.S. 131, 137 (1992)("Lack of subject-matter jurisdiction...precludes further adjudication.") The Supreme Court has asserted over and over, "[T]he requirement that jurisdiction be established as a threshold mater spring[s] from the nature and limits of the judicial power of the United States and is inflexable and without exception." Steel, supra, quoting Mansfield Co. & L.M.R. Co. Swan, 111 U.S. 379, 382 (1884); Insurance Corp. of Ireland, Ltd. 456 U.S. @ 702.

Because subject-matter jurisdiction "involves a court's power

to hear a case, [and thus] can never be forfeited or waived...correction [is mandatory] whether the error was raised in district court or not. U.S. v. Cotton, 535 U.S. @ 630; Steel & Co.,supra @ 94-95. When a district court did "not have subject-matter jurisdiction over the underlying action...[its] process[ess] [are] void and an order of [punishment] based [thereupon]...must be reversed." U.S. Catholic Conf., 487 U.S. 77; Willy v. Coastal Corp., 503 U.S. @ 139 ("The [punishment] order itself should fall with a showing that the court was without authority to enter the decree.") Ex parte Fisk, 113 U.S. 713, 718 (1885)(When...a court of the United States undertakes by its process, to punish a man... [respecting] an order which that court had no authority to make, the order itself, being without jurisdiction, is void, and the order punishing...is equally void.")

     Habeas Corpus review, "Is limited to the examination of the jurisdiction of the court whose judgment of conviction is challenged." INS, supra, @ 311-3144 (20010; Bowen v. Johnston, 306 U.S. 19, 23 (1949). A "court has" jurisdiction to render a particular judgment only when the offense charged is within the class of offenses placed by the law under it's jurisdiction." 306 U.S. @ 24. If it is found that the court lacked jurisdiction to try petitioner, the judgment is void and the prisoner must be discharged immediately. Ex parte Yarbrough, 110 U.S. 651, 654 (1884).

     Petitioner has established that the text of H.R. 3190, signed by respective House Officers and the President of the United States: (1) failed to pass the House of Representatives, and (2) that

                                    40

the legislative process continued after Congress adjourned by
single officer of each House, acting pursuant to H.Con.Res. 219,
without quorums in either House, all of which violated Article
I, Section 5, Cl. 1; Article I, Section 7, Clause 2 & 3, and
any of which rendered Public Law 80-772 Unconstitutional and
void ab initio. Maybury v. Madison, 5 U.S. 137, 180 (1803)("A
law repugnant to the constitution is void and...courts, as well
as other departments, are bound by the instrument.")

    Therefore, because "The offense[s] charged...[were] placed
by law under [the] jurisdiction," of the district court, pursuant
to 18 U.S.C. § 3231 of Public Law 80-772, which is Unconstitutional,
and "void, the court was without jurisdiction and the prisoner
must be discharged." Yarbrough, 110 U.S. @ 654. Since Public
Law 80-772, has never been enacted as required by Article I,
§ 5, Cl. 1 and Article I, § 7, Cl. 2 & 3 thereof, rendering void
ab initio, the jurisdiction by which the respective District
Courts acted to convict, enter judgment, and order Petitioner
imprisoned in Executive Custody, the District Courts' action
was "ultra vires." Ruhrgas Ag., 526 U.S. @ 583 (quoting Steel
Co., 523 U.S. @ 101-102), and "coram non judice." Rhode Island
V. Massachuetts, 37 U.S. (12 Pet.) @ 720.

    The conviction and jugment thereupon, "being without jurisdiction,
is void, and the order punishing...is equally void." Ex parte
Fisk, 113 U.S. @ 718; United States Cath. Conf., 487 U.S. @ 77;
Willy v. Coastal Corp., 503 U.S. # 139. This is precisely the

function of habeas corpus, i.e. to "examine...the jurisdiction of the court whose judgment of conviction is challenged." <u>Bowen v. Johnston</u>, 306 U.S. @ 23, and where, as herein, those courts were clearly "without jurisdiction...the prisoner...must be discharged immediately." <u>Ex parte Yarbrough</u>, supra @ 654: <u>Ex parte Lange</u>, 85 U.S. (18 Wall.) 163, 166 (1874).

## CONCLUSION

WHEREFORE, for the aforementioned reasons and claims of receiving Ineffective Assistance of Counsel, entering a Plea Unknowingly and Unintelligently, having Facts not found by a Jury nor admitted to used against him, and the Court lacking Jurisdiction to pass judgment, Petitioner prays the Writ will issue and that he be immediately discharged from his unlawful imprisonment.

Petitioner declares under the penalty of perjury that the facts stated or alleged herein, are true to the best of his knowledge, pursuant to 28 U.S.C. § 1746.

Respectfully Submitted this _1_ day of _September_, 2010.


_____
Baudel Ortiz, pro se

## CERTIFICATE OF SERVICE

I, Baudel Ortiz, Petitioner, certify that a true exact copy of the attached 2255 Petition and Motion was placed in the legal Mail box, with first-class postage attached, and mailed to the following addressee, on this _1_ day of _September_, 2010.

_____